IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
                              )
MICHELLE HANNIGAN-ALEO,       )
                              )   12 CV 4157
          Plaintiff,          )
                              )   Magistrate Judge Arlander Keys
                              )
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of        )
Social Security,              )
                              )
          Defendant.          )
```

MEMORANDUM OPINION AND ORDER

This case is before the court on Michelle Hannigan-Aleo's motion for summary judgment. She seeks a reversal or remand of the Commissioner's decision to deny her application for Supplemental Security Income. Cross motions for summary judgment are before this court, and for the reasons set forth below, the defendant's motion is granted and the Commissioner's decision is affirmed.

Background

On January 4, 2009, Michelle Hannigan-Aleo applied for Supplemental Security Income ("SSI"), alleging that she became disabled as of December 19, 2007 due to obesity, female complications and hernia. (R. at 61, 108.) Ms. Hannigan-Aleo's claim was denied initially and after reconsideration. (R. at 17.) Ms. Hannigan-Aleo then requested a hearing before an Administrative Law Judge ("ALJ"), and the case was assigned to

ALJ Janice Burning, who held the hearing on March 18, 2010. (R. at 16-17.)

I.   Plaintiff's Hearing Testimony

Ms. Hannigan-Aleo testified that she was 5'5" and weighed 320 pounds. (R. at 32.) Ms. Hannigan-Aleo testified that she completed high school, had no specialized training, and had never been in the military. (R. at 33.) She testified that she had panic attacks, hallucinations, trouble walking, and could only sit for twenty to thirty minutes because of her back pain. (R. at 37-38.) She testified that she was unable to bend. (R. at 39.) She testified that she had no energy and trouble with her memory and concentration. (R. at 46.) When asked if she had low self-esteem, she testified to having "no feelings at all", as well as difficulty concentrating, and frequent crying spells. (R. at 36.)

She testified that her sleep schedule had been inconsistent but that she usually slept during the day. (R. at 40.) She testified that she typically got home from work about 9am, made breakfast in order to take her medication, slept until 2:15pm, got ready to go to work again, returned from work around 4pm, and then slept more. (R. at 40.)

Ms. Hannigan-Aleo testified that she did not always take her medication as prescribed. (R. at 36.) She explained that not taking her medication as prescribed was partially due to her

forgetting to take the medication. (R. at 36.) She testified that she no longer used her inhaler, and was taking medication for her high blood pressure and diabetes. (R. at 35.) She testified that she was using a Byetta gun, for her diabetes, but stopped because it was making her ill. (R. at 35.)

Ms. Hannigan-Aleo testified that she stopped taking medication for the arthritis in her back, because she decided not to mix the medication with her post-surgery Vicodin. (R. at 38.) She testified that she never had more arthritis pain medication prescribed and was waiting to see the doctor. (R. at 38.) She was taking Seroquel for her hallucinations, but went off it because it interfered with her sugar levels. (R. at 46.) She testified that she was having more hallucinations, but that they were not severe. (R. at 47.)

With regard to work, Ms. Hannigan-Aleo testified that she was currently employed as a crossing guard. (R. at 38.) She testified that she drove to work every day. (R. at 41.) She testified that her work required her to stand for one hour, twice a day and walk into the road to stop traffic. (R. at 37-38.) She testified that her job was stressful because the drivers did not always listen, and that she had almost been hit by a car several times. (R. at 48-49.) She testified that she screamed at the drivers but not the pedestrians or children. (R. at 49.)

3

Ms. Hannigan-Aleo testified that she had worked consistently since she filed for SSI, on December 19, 2007. (R. at 34.) She testified that the only break in her current employment occurred after her surgery. (R. at 34.) She did not work from June 2009 until one month before the hearing (February). (R. at 34.) She testified that her job was tougher since she returned to work, and that she sometimes needed assistance. (R. at 48.)

With regard to her daily life, Ms. Hannigan-Aleo testified that she was living in an apartment with her two children and a male friend who took care of her. (R. at 33.) She testified that she did not live with her husband. (R. at 32.) She testified that she sometimes had trouble caring for her personal needs, and sometimes needed help putting on her socks and shoes. (R. at 40.) She testified that her friend would remind her to take her medication and did so even before he moved in. (R. at 44.) She testified that her children did not help her with any household activities, but that her friend, Don, did. (R. at 47.)

She testified that, depending on her pain level, she was able to prepare meals, but that 99 percent of the time her friend helped her. (R. at 40.) She testified that she was not allowed to lift anything heavier than a gallon of milk. (R. at 39.) She testified that she did not use an assistive devise to help her move, but simply took her time. (R. at 39.) She also testified

4

that she had difficulty climbing stairs, and had to walk up two flights of stairs to reach her apartment. (R. at 39.) She testified that she only shopped at grocery stores that had electric carts available. (R. at 40.)

She testified that she could clean the dishes, but could not do laundry, due to the lifting and stairs. (R. at 41.) She had not tried to make the bed, but testified that she did not think she could because it would require lifting the mattress. (R. at 41.) She testified that she could not take out the garbage, and that when she swept, she had to pile the debris for someone else to pick up, because she could not bend over to pick it up. (R. at 41.)

Ms. Hannigan-Aleo testified that she received government support from Medicaid and used a Link Card. (R. at 34.) She testified that she utilized support services from Threshold. (R. at 45.) She testified that the people from Threshold stopped by twice a week, and provided her with transportation when she needed it. (R. at 45.) She testified that she had been in the program for over three years. (R. at 45.) She testified that a program called Thrive provided her with psychiatric support and counseling. (R. at 45.) Ms. Hannigan-Aleo testified that she saw a psychiatrist once a month and a counselor twice a month. (R. at 36.) She testified that she did not think about harming

herself. (R. at 36.) She testified that she had not sought treatment for her panic attacks. (R. at 37.)

Ms. Hannigan-Aleo testified that it took five months and five different medications, before it was determined that Cymbalta was the right medication for her. (R. at 45-46.) She testified that she was not as sad while on Cymbalta, but that she was still depressed. (R. at 46.)

Ms. Hannigan-Aleo testified that she was not a part of any community organizations, did not go out, and had no hobbies or interests. (R. at 42-43.) She testified that, when her son was younger and in school, she did not participate in school events or parent-teacher conferences. (R. at 42.) She testified that the only friend or family member she ever saw was her sister, and that was partly because she had to get mail from her. (R. at 42.) She testified that she watched some television and used her computer for about three hours a week. (R. at 43.) She testified that she had difficulty following through and finishing what she had started. (R. at 47.)


II.  Vocational Expert Hearing Testimony

A vocational expert ("VE") testified at the hearing on March 18, 2010. (R. at 49.) The VE testified that she had not discussed the case with the plaintiff, that her testimony was consistent with the Dictionary of Occupational Titles, and that

6

the job descriptions were consistent with the national economy. (R. at 49-51.) The VE testified to having familiarity with the jobs in the applicable region (Chicago, Naperville, and Joliet Metro.), hearing the relevant testimony, reviewing the exhibits and consulting the US Bureau of Labor and Statistics. (R. at 50.) The VE testified that Ms. Hannigan-Aleo's work as a crossing guard had an SVP of 2, and had an exertion level of light. (R. at 50.)

During the testimony, the ALJ asked the VE, hypothetically, what employment an unskilled person, limited to three-step repetitive tasks, could find if they were only able to: carry ten pounds occasionally and less than ten pounds frequently; stand for two hours a day and sit for six; not climb stairs, ladders, ropes, scaffolds, but occasionally climb ramps and stairs; occasionally stoop and balance, kneel and crawl; and have occasional contact with the public or supervisors and co-workers. (R. at 50-51.)

The VE testified that there were three types of jobs available to such a person. (R. at 51.) The VE testified that the person could act as a sorter, which has an SVP level of 2 and exertion level of sedentary. (R. at 51.) The VE testified there were 391 sorter jobs in the area. (R. at 51.) The VE testified that such a person could be a final assembler, which has an SVP level of 2 and an exertion level of sedentary. (R. at 51.) The

VE testified that there were 1225 final assembler jobs in the area.  (R. at 51.)  Finally, the VE testified that such a person could be an inspector/check weigher, which has an SVP level of 2 and an exertion level of sedentary.  (R. at 51.)  The VE testified that there were 3773 inspector/check weigher jobs in the area.  (R. at 51.)

The ALJ amended the hypothetical to ask what jobs were available if that person needed to avoid interaction with the public.  (R. at 51.)

The VE testified that there would be no change in employment options, and the person could perform any of the three previously mentioned jobs.  (R. at 51.)

Then the ALJ further amended the hypothetical to assume that that person would be off task for 20% of the day, and be limited to working for only four hours out of every eight hour workday.  (R. at 51.)  The VE testified that such a person could not perform the listed jobs or any other jobs in the area.  (R. at 51.)

III. Medical Record

Ms. Hannigan-Aleo's medical records mentioned various mental and physical conditions.  Her mental issues included: bipolar disorder, major depression, borderline personality disorder, relational problems, stress, being passively suicidal, and

8

feeling labile, agitated, helpless, and a diminished pleasure
from activities. (R. at 221-23, 421, 424.)

Ms. Hannigan-Aleo's medical record listed physical
conditions including: miscarriage, lethargy, hypersomnia, lack of
energy, foot swelling, asthma, suspected strangulated ventral
hernia, ischemia of the bowel, unspecified ganglion, lump on
foot, unspecified uticartia, severe itching, tight throat, four
pulled teeth, umbilical hernia, chronic smoking, pruritic rash,
urinary incontinence, hypertension, infertility,
hypercholesterolemia, removed gallbladder, palpitations,
shortness of breath, DM w/o complications type II (diabetes type
II), diarrhea, leaking cyst, suspected bursitis, possible myopic
nails, heel spurs, bothersome ear, lump on hip, lack of menstrual
cycle, mild degenerative disk disease, anterior spurs,
transitional lumbosacral vertebra, arthritis, acute pharyngitis,
herpes simplex, cough and phlegm, bronchospasms, fistula,
unspecified disorder of skin and subcutaneous tissue, female
stress incontinence, other abnormal glucose, drug rash and dry
skin dermatitis, small bowel obstruction, appendicitis with
abscess, constipation and an allergy penicillin. (R. at 222-23,
234-35, 237, 245, 257, 259, 260, 277-79, 281, 284, 288-90, 293,
306-08, 330, 334, 343, 355, 359, 393, 620.)

Ms. Hannigan-Aleo had reported pain in various places, including her: back, knee, buttocks, upper abdomen, and foot. (R. at 223, 257, 295.)

On November 18, 2009, Ms. Hannigan-Aleo had an active problems list including: hypersomnia, bipolar disorder, DM without complication type II (diabetes type II), essential hypertension (benign), Myopia, generalized osteoarthritis (unspecified site), presbyopia, tobacco abuse, family history of ischemic heart disease, mixed hyperlipidemia, DM renal manifestations type II (uncontrolled), DM without complication type II (uncontrolled), abnormal cardiovascular stress test, recurrent ventral hernia with obstruction, postoperative wound infection, wound, open wound of abdominal wall (lateral, without mention of complication), and morbid obesity. (R. at 647.)

Ms. Hannigan-Aleo is morbidly obese and has had obesity-related medical issues for years. (R. at 22.) "Her physicians have suggested possible surgery to control her weight, [as] attempts at changes in diet proved unsuccessful." (R. at 19.) Even her depressive disorder was linked to her obesity. (R. at 22.) During a Disability Progress interview, Ms. Hannigan-Aleo stated that her conditions first began interfering with her working in April of 2007. (R. at 134.) She stated that her conditions prevented her from working in December 2007. (R. at 134.) She reported that her weight also makes it harder to get

out of a chair or bed.  (R. at 158.)  She stated that, before she was overcome by her condition, she was more active with friends and family.  (R. at 161.)  She also stated that she can neither stand nor sit for a long time. (R. at 189.)  She stated that she does not enjoy any activities, and that she loses interest in activities fast.  (R. at 164-65.)  She also reported that she has to be reminded to eat, take her medication, do the laundry and cook.  (R. at 162.)

IV.  Ms. Hannigan-Aleo's SSA Filings

     In March of 2008, Ms. Hannigan-Aleo answered a Physical Impairments Questionnaire.  (R. at 157.)  In the questionnaire, she stated that she could use kitchen tools to prepare simple meals to feed herself.  (R. at 157.)  She also stated that she could sit for two hours without getting up.  (R. at 158.)  She stated that the kids usually cooked dinner, and that a friend called her to remind her to take her medications and eat breakfast.  (R. at 160.)  However, in the same report, Ms. Hannigan-Aleo reported that she cared for her two children by cooking for them.  (R. at 161.)  The report further stated that she typically prepared meals once a day.  (R. at 162.)  She stated that she could, and did, do the laundry and clean the dishes.  (R. at 162.)  She stated that she went outside every day and that she drove herself around.  (R. at 163.)  Ms. Hannigan-

11

Aleo reported that she had no family or friend problems. (R. at 165.) She reported that her conditions affected her ability to understand. (R. at 165.) She stated that she noticed an unusual "fear of traffic on the job." (R. at 166.)

Ms. Hannigan-Aleo reported that, due to her conditions, she began needing more assistance from her son in 2008. (R. at 193.) She stated that the condition had deteriorated to the point where her son helped her get in and out of the car and cook. (R. at 185.)

In a Disability Report-Appeal, Ms. Hannigan-Aleo reported several changes in her condition. (R. at 189.) These included becoming diabetic and arthritis in her knees, feet and back. As a result of the arthritis, she was not able to sit or stand for very long. (R. at 189.) She also reported that her son was helping her in and out of the bathtub, getting dressed, and going up and down the stairs. (R. at 193.) In the report, Ms. Hannigan-Aleo stated she worked two hours a day as a crossing guard and had difficulty standing for that entire time. (R. at 194.) However, in another disability report, she stated that she had "no problems" caring for herself. (R. at 172.)

Ms. Hannigan-Aleo has held various jobs over the years. She worked at Wendy's until 1985, drove a bus until 1986, worked three different security jobs between 1986 and 1989, worked at Burger King until 1996, and then was unemployed from 1996 to

2005, when she worked as a crossing guard. (R. at 149.) As a crossing guard, she was paid $10.99 an hour and worked two hours a day. (R. at 150.) The first hour was at the beginning of the school day, and the second at the end. (R. at 141.) She had to take several months off to recover from surgery, but was allowed back after her recovery. (R. at 34.)


V.   RFC Assessment

On April 15, 2008, Dr. Terry Travis, a non-examining physician, completed a Psychiatric Review Technique form for Ms. Hannigan-Aleo. (R. at 392.) Dr. Travis reported that Ms. Hannigan-Aleo had a major depressive disorder. (R. at 395.) He reported that her mood disturbance did not precisely fit into a diagnostic category. (R. at 395.) However, Dr. Travis concluded that she had moderate difficulties concentrating, but only mild limitations in her daily living and social functioning. (R. at 402.) Dr. Travis reported that Ms. Hannigan-Aleo takes care of her family and friend. (R. at 404.)

Dr. Travis also completed a mental residual function capacity assessment form of Ms. Hannigan-Aleo. (R. at 408.) He reported that Ms. Hannigan-Aleo had no issues understanding and some moderate limitations with her prolonged concentration and adhering to a schedule. (R. at 406.) He noted some marked social and adaptation issues, however, he stated that Ms.

Hannigan-Aleo "is able to function consistently at a reasonable rate within a schedule and . . . is able to do multistep tasks that can be learned within 1-6 months in a routine work setting." (R. at 407-08.)

On April 17, 2008, Dr. Robert Patey, another non-examining physician, completed a physical residual function capacity assessment of Ms. Hannigan-Aleo. (R. at 417.) There were no major work or life limitations mentioned within the report. (R. at 410-17.)

On January 21, 2009, Dr. Margaret Robling, Ms. Hannigan-Aleo's treating psychiatrist, completed a questionnaire for Ms. Hannigan-Aleo. (R. at 423.) Dr. Robling reported that Ms. Hannigan-Aleo's affective disorder would moderately limit her daily living, and markedly limit her concentration and social functioning. (R. at 423.)

On January 26, 2009, Kristen Nicolosi, a non-physician clinical counselor, reported on Ms. Hannigan-Aleo's condition. (R. at 424-25.) In her report, she concluded that Ms. Hannigan-Aleo would not be able to work in a competitive environment for eight hours a day, five days a week (R. at 425.)

In February 2008, Ms. Ward, Ms. Hannigan-Aleo' case manager, completed a function report on Ms. Hannigan-Aleo. (R. at 141.) Ms. Ward stated that Ms. Hannigan-Aleo worked as a crossing guard 2-4 hours a day. (R. at 141.) Ms. Ward also stated that Ms.

14

Hannigan-Aleo's conditions affect her motivation and movement.
(R. at 142.)  Ms. Ward reported that Ms. Hannigan-Aleo did not
need to be reminded to take her medication.  (R. at 142.)  Ms.
Ward reported that Ms. Hannigan-Aleo made dinner once a week, and
the dinner was usually a frozen dinner.  (R. at 143.)

    Ms. Ward also explained that Ms. Hannigan-Aleo had
difficulty doing laundry, cooking, and cleaning, because of
financial reasons.  (R. at 142.)  Ms. Ward also reported that Ms.
Hannigan-Aleo was, however, able to do the laundry and clean.
(R. at 143.)  Ms. Ward reported that Ms. Hannigan-Aleo would go
outside to smoke.  (R. at 143.)  Ms. Ward reported that Ms.
Hannigan-Aleo drove herself and her children to doctor's
appointments often.  (R. at 143.)  Ms. Ward reported that Ms.
Hannigan-Aleo's conditions did not affect her ability to
understand.  (R. at 145.)


VI.  ALJ Decision

    The ALJ issued a decision on June 29, 2010, finding that Ms.
Hannigan-Aleo was not disabled under section 1614(a)(3)(A) of the
social security act from December 19,2007 through the date of the
decision.  (R. at 24.)  The ALJ applied the five-step sequential
analysis as required by the Act, under 20 C.F.R. 416.920(g).

    The ALJ found that the plaintiff's condition did, to some
degree, impair her ability to work.  (R. at 19.)  However, the

ALJ found an insufficient amount of evidence to find Ms. Hannigan-Aleo disabled. (R. at 24.)

At step one, the ALJ determined that Ms. Hannigan-Aleo's work as a crossing guard did not constitute substantial gainful activity. (R. at 19.)

At step two, the ALJ determined that Ms. Hannigan-Aleo's back pain, depressive disorder, obesity and obesity-related shortness of breath were severe impairments. (R. at 19.)

At step three, the ALJ determined that Ms. Hannigan-Aleo's impairments did not meet or equal any of the listed impairments in the enumerated listings. (R. at 20.)

At step four, the ALJ determined that Ms. Hannigan-Aleo "has the residual functional capacity to perform sedentary work . . . with no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, crouching, crawling, kneeling, or climbing of ramps and stairs; occasional contact with the public, supervisors, co-workers; and involving [three] step unskilled simple repetitive tasks." (R. at 21.)

The ALJ supported this determination, by finding that, while the medical record supports Ms. Hannigan-Aleo's various symptoms, her subjective claims as to the intensity of the pain and impairments were not credible. (R. at 22.)

The ALJ noted that Ms. Hannigan-Aleo's stress level and depression had subsided somewhat since her husband left in 2009.

16

(R. at 22.)  Further, Ms. Hannigan-Aleo is able to work as a crossing guard, which required her to interact with the public and stand for an hour at a time.  (R. at 22.)  The ALJ found that Ms. Hannigan-Aleo was capable of sedentary work activity, as demonstrated by her activity level as a crossing guard, and the lack of medical evidence to the contrary.  (R. at 2.)  The ALJ also found that Ms. Hannigan-Aleo's claims that she could not perform at her job both physically or mentally, are countered by the fact that she had stable employment as a crossing guard.  (R. at 22-23.)  The ALJ indicated a lack of credibility because Ms. Hannigan-Aleo claimed to need to be reminded to eat, however she was suffering from morbid obesity.  (R. at 23.)  Finally, the ALJ did not accord much weight to several medical records due to their having been based on subjective assertions made by her, and because they were not supported by her work as a crossing guard. (R. at 22.)

At step five, the ALJ determined that "based on the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform." (R. at 23.)  After listening to the testimony of a vocational expert, the ALJ determined that Ms. Hannigan-Aleo would be able to work as a sorter (391 Chicago), final assembler

(1225 Chicago), or an inspector/checker/weigher (3773 Chicago). (R. at 24.)

Ms. Hannigan-Aleo requested review by the Appeals Council, but it was denied on March 28, 2012. Thus the ALJ's decision became the final decision of the Commissioner. Ms. Hannigan-Aleo filed a complaint with the court on May 29, 2012. The parties consented to exercise of jurisdiction by a magistrate judge on August 28, 2012. Before the court are cross-motions for summary judgment. The court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## Standard of Disability Adjudication

An individual claiming a need for SSI must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his/her past relevant work, and fifth; the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v.*

*Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405 (g); *Steele v. Barnhart*, 920 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough

that the record contains evidence to support the ALJ's decision;
if the ALJ does not rationally articulate the grounds for that
decision, or if the decision is insufficiently articulated, so as
to prevent meaningful review, the Court must remand. *Id.*

## Discussion

The plaintiff argues that the ALJ's decision must be
reversed or remanded because the ALJ failed to properly evaluate
the opinion evidence, erred in determining the plaintiff's
credibility, and erred in determining the plaintiff's residual
functional capacity.

I.   The Opinion Evidence

Plaintiff asserts that the ALJ erred in evaluating the
opinion evidence in the record by not articulating her reasoning,
failing to state the weight attributed to each opinion, making
her own medical evaluation, and not giving controlling weight to
treating physicians' opinions.  The heart of Plaintiff's concern
is whether the ALJ made the required evaluation and supported her
decision appropriately.

First, the court finds that the ALJ reasonably articulated
her decision.  "The ALJ must minimally articulate his reasons for
crediting or rejecting evidence of disability." *Scivally v.
Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992).  There is no
requirement to state every reason supporting a decision.  Here,

the ALJ discussed plaintiff's obesity, other conditions, current work, and lack of credibility. (R. at 21-23.) This is not a boilerplate opinion, and the court finds that the ALJ appropriately articulated her reasoning.

Next, the court finds that the ALJ did not make her own medical determination. "The Secretary's decision must be based on testimony and medical evidence in the record, and the Secretary 'cannot make his own independent medical determination about the claimant.'" *Scivally*, 966 F.2d at 1076 (*quoting Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985)). Further, an ALJ should consider all relevant evidence including a plaintiff's subjective assertions of pain. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

Here, the ALJ discussed the plaintiff's pain, specifically discounted the plaintiff's testimony, and subsequently, the medical reports that were based on the plaintiff's subjective assertions, because of the plaintiff's lack of credibility. (R. at 21-23.) Discounting medical reports, in this instance, is not an indication that the ALJ did not consider the medical reports or listen to the plaintiff's subjective assertions of pain, but rather an indication that the ALJ thoughtfully weighed the evidence before her. The plaintiff's claim that the ALJ completely failed to evaluate or consider medical evidence is without merit. The ALJ noted the VE's testimony and the

21

plaintiff's success as a working crossing guard to support her final determination.

In addition to the reasoning stated in the ALJ's opinion, there are also various reports that support the ALJ's decision to discount the plaintiff's testimony and rely on other considerations in making her determination.  In one report by Plaintiff, she stated that the children have to cook dinner, yet, she also stated that she cared for the children by cooking for them.  (R. at 160-61.)  Plaintiff claimed to have difficulty with stairs, however, her case manager reported that she goes outside the apartment to smoke although the apartment is up two flights of stairs.  (R. at 39, 143.)  Additionally, the plaintiff testified that her friend moved in to take care of her, but in a medical report, it was stated that she took care of her friend, and she reported after her surgery that she was able to take care of herself, as well.  (R. at 33, 172, 404.)  After a thorough analysis of the record, there is substantial evidence to support the ALJ's determination.

Further, the ALJ did not err by not giving controlling weight to the opinion evidence of Dr. Robling or Clinical Counselor Kristen Nicolosi, who is not a treating physician.  "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with

other substantial evidence in the record." *Clifford*, 227 F.3d at 870. "An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer "good reasons" for declining to do so" and determine what weight his opinion was due under the applicable regulations. See 20 C.F.R. § 404.1527(d)(2)." *Larson v. Astrue*, 615 F.3d 744, 749 & 751 (7th Cir. 2010). Here, the ALJ stated that she did not give significant weight to the opinions because they lacked credibility, as they were based on statements made by the discredited plaintiff. (R. at 23.)

The ALJ's determination that Dr. Robling's report lacks credibility is supported by the record. Dr. Robling's report is inconsistent, stating that the plaintiff both does, and does not, have trouble concentrating. (R. at 421, 423.) With regard to Ms. Nicolosi's report, one major fact is that Ms. Nicolosi only began seeing the plaintiff after her SSI claim was denied. (R. at 57, 424.)

When treating physician opinions are not granted controlling weight, then "[a]n ALJ must consider the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson*, 615 F.3d at 751. While it is required that an ALJ consider all of the aforementioned factors, it is not required that the ALJ

23

articulate the consideration given to each factor. *Hall v. Astrue*, 3:11-CV-72-TLS, 2012 WL 2847914 (N.D. Ind. July 11, 2012). The above mentioned factors were not clearly listed in the ALJ's opinion, but there is evidence that the ALJ considered these factors. The ALJ mentioned that there seemed to be no credible support, as the opinions were based on incredible assertions by the plaintiff. (R. at 23.) This determination links directly with the 'support for a physician's opinion' factor, and is an indication that the ALJ did review the enumerated factors.

The court finds that there was sufficient articulation of the evidence to support the ALJ's decision, and that the ALJ did not err by not giving controlling weight to the treating physicians' opinions.

II. The Plaintiff's Credibility

The plaintiff claims that the ALJ erred in determining her credibility, because the ALJ did not sufficiently articulate her reasoning and did not include unfavorable evidence in her evaluation.

As "hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "When assessing an

24

ALJ's credibility determination . . . we merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be "'patently wrong,'" *Jens,* 347 F.3d at 213 (quoting *Powers,* 207 F.3d at 435), and deserving of reversal." *Elder*, 529 F.3d at 413-14.

"In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). "Additionally . . . the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Id.* "Failing to acknowledge this effect may impact the ALJ's credibility determination." *Id*.

The ALJ states various inconsistencies in the case to support her finding that Plaintiff lacks credibility: Plaintiff claims to forget to eat, yet she is morbidly obese; Plaintiff utilizes a driver service, yet she claims she is able to drive

herself; and Plaintiff has consistently worked as a crossing guard. (R. at 22-23.) It is important to note that, based on the VE's testimony, working as a crossing guard is more strenuous work, though for a shorter time, than is necessary to obtain substantial gainful employment. (R. at 50.)

There is no requirement that the ALJ continue to list every concern or inconsistency related to Plaintiff's credibility. In this instance, the ALJ listed various key concerns. However, there was additional support for the ALJ's decision. First, the plaintiff claims to have difficulty with stairs, but her case manager reported that she goes outside the apartment to smoke, when the apartment is up two flights of stairs. (R. at 39, 143.) Additionally, she testified that her friend moved in to take care of her, but in a medical report, it was stated that she takes care of her friend, and she also reported, after her surgery, she was able to take care of herself. (R. at 33, 172, 404.) Further, the ALJ explicitly considered the complications her obesity contributes. (R. at 22.) The court finds that the ALJ sufficiently articulated the substantial evidence supporting her decision.

There is an additional consideration worth mentioning. The Plaintiff has self-adjusted and discontinued various medical treatments. (R. at 36, 38.) "In order to get benefits, you must follow treatment prescribed by your physician if this treatment

26

can restore your ability to work." 20 C.F.R. § 404.1530(a). "If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." 20 C.F.R. § 404.1530(b). This is not an issue that has been raised by either party, but is informative. Not taking pain medication is an indication that a patient's pain level may not be as severe as described, or possibly manageable. Not following prescribed treatment for pain regulation again supports the ALJ's determination that the plaintiff lacks credibility. The court finds that there was substantial evidence and clear articulation to affirm the ALJ's decision that Plaintiff was not credible.[1]

III. The Plaintiff's Residual Functional Capacity

Plaintiff claims that the ALJ erred in determining her RFC because the ALJ's determination lacks any supporting medical evidence.

When it is established that a plaintiff has no relevant past work experience then "[the ALJ] [is] required to establish that [the plaintiff] has the capability of performing other work in the national economy." *Clifford*, 227 F.3d at 873. "This finding must be supported by substantial evidence in the record." *Id*.

[1] A further note about the plaintiff's assertion that the ALJ erred in determining her credibility; this determination is crucial to the plaintiff's appeal as it is the foundation of the ALJ's opinion evidence determination as well as being the threshold consideration for the plaintiff's Step three and five claims. (R. at 15.) This is so, as the plaintiff claims that step three and five would have been decided differently if sufficient weight was given to opinions and the RFC was correctly determined, and the key support for both of these determinations was the credibility finding. These claims, which are buried in the plaintiff's appeal, will not be further considered as the threshold question has been decided against them.

The ALJ determined Plaintiff's RFC by considering that the plaintiff currently works at a more strenuous job, albeit part-time, and lacks credibility. (R. at 22-23.) These are serious considerations made by the ALJ. The court finds that this was not a perfunctory examination of a medical record, and, for the aforementioned reasons, the ALJ's RFC determination is sufficiently articulated and supported by substantial evidence.

### Conclusion

For the reasons set forth above, the Court DENIES Ms. Hannigan-Aleo's motion for summary judgment [#18]. The Commissioner's decision is affirmed.

Date: October 15, 2013

E N T E R E D:

_____

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT